# Exhibit A

FILED
10/31/2018 1:51 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH13574

FILED DATE: 10/31/2018 1:51 PM   2018CH13574

| | |
|---|---|
| **2120 - Served** | **2121 - Served** |
| **2220 - Not Served** | **2221 - Not Served** |
| **2320 - Served By Mail** | **2321 - Served By Mail** |
| **2420 - Served By Publication** | **2421 - Served By Publication** |
| **Summons - Alias Summons** | **(08/01/18) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Jerome Treadwell
_____
(Name all parties)

v.

Power Solutions Intl. & Novatime Tech, Inc.
_____

Case No.  2018-CH-13574

Novatime Technology, Inc.
R/A: Incorp Services, Inc.
901 S. 2nd St., Suite 201
Springfield, IL 62704

☑ **SUMMONS**   ☐ **ALIAS SUMMONS**

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons,** not counting the day of service.  To file your answer or appearance you need access to the internet.  Please visit www.cookcountyclerkofcourt.org to initiate this process.  Kiosks with internet access are available at all Clerk's Office locations.  Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service.  If service cannot be made, this Summons shall be returned so endorsed.  This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 3

**Summons - Alias Summons**          **(08/01/18) CCG 0001 B**

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

10/31/2018 1:51 PM DOROTHY BROWN

Atty. No.: 43734

Witness: _____

Atty Name: Andrew Ficzko

Atty. for: Jerome Treadwell

DOROTHY BROWN, Clerk of Court

Address: 100 N. Riverside Plaza, Suite 2150

City: Chicago

Date of Service: _____

State: IL    Zip: 60606

(To be inserted by officer on copy left with Defendant or other person):

Telephone: 312-233-1550

Primary Email: aficzko@stephanzouras.com

FILED DATE: 10/31/2018 1:51 PM 2018CH13574

## CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

- Richard J Daley Center
  50 W Washington
  Chicago, IL 60602

- District 2 - Skokie
  5600 Old Orchard Rd
  Skokie, IL 60077

- District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008

- District 4 - Maywood
  1500 Maybrook Ave
  Maywood, IL 60153

- District 5 - Bridgeview
  10220 S 76th Ave
  Bridgeview, IL 60455

- District 6 - Markham
  16501 S Kedzie Pkwy
  Markham, IL 60428

- Domestic Violence Court
  555 W Harrison
  Chicago, IL 60607

- Juvenile Center Building
  2245 W Ogden Ave, Rm 13
  Chicago, IL 60602

- Criminal Court Building
  2650 S California Ave, Rm 526
  Chicago, IL 60608

### Daley Center Divisions/Departments

- Civil Division
  Richard J Daley Center
  50 W Washington, Rm 601
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Chancery Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Domestic Relations Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Civil Appeals
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Criminal Department
  Richard J Daley Center
  50 W Washington, Rm 1006
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- County Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Probate Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Law Division
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

- Traffic Division
  Richard J Daley Center
  50 W Washington, Lower Level
  Chicago, IL 60602
  Hours: 8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
cookcountyclerkofcourt.org

FILED
10/30/2018 4:41 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH13574

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| JEROME TREADWELL, individually, and on behalf of all others similarly situated, ) ) ) | |
| Plaintiff, ) ) | Case No.    2018CH13574 |
| v. ) ) | |
| POWER SOLUTIONS INTERNATIONAL, INC., and NOVATIME TECHNOLOGY, INC., ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Jerome Treadwell ("Treadwell" or "Plaintiff"), by and through his attorneys, individually and on behalf of all others similarly situated (the "Class"), brings the following Class Action Complaint ("Complaint") pursuant to the Illinois Code of Civil Procedure, 735 ILCS §§ 5/2-801 and 2-802, against Power Solutions International, Inc. and NOVAtime Technology, Inc. (Collectively "Defendants"), their subsidiaries and affiliates, to redress and curtail Defendants' unlawful collection, use, storage, and disclosure of Plaintiff's sensitive biometric data. Plaintiff alleges as follows upon personal knowledge as to himself, his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys.

## NATURE OF THE ACTION

1.     Defendant Power Solutions International, Inc. ("Power Solutions") is a company that manufactures and distributes engines and power systems to industrial and on-road sectors.

2.     Defendant NOVAtime Technology Inc. ("NOVAtime") is a technology company that provides software and hardware that tracks and monitors employees' time and attendance to companies worldwide.

3.     When Power Solutions hires an employee, he or she is enrolled in its NOVAtime employee database using a scan of his or her fingerprint. Power Solutions uses the NOVAtime employee database to monitor the time worked by its hourly employees.

4.     While many employers use conventional methods for tracking time worked (such as ID badge swipes or punch clocks), Power Solutions' employees are required to have their fingerprints scanned by a biometric timekeeping device.

5.     Biometrics are not relegated to esoteric corners of commerce. Many businesses – such as Defendants – and financial institutions have incorporated biometric applications into their workplace in the form of biometric timeclocks, and into consumer products, including such ubiquitous consumer products as checking accounts and cell phones.

6.     Unlike ID badges or time cards – which can be changed or replaced if stolen or compromised – fingerprints are unique, permanent biometric identifiers associated with each employee. This exposes Power Solutions' employees to serious and irreversible privacy risks. For example, if a database containing fingerprints or other sensitive, proprietary biometric data is hacked, breached, or otherwise exposed – like in the recent Yahoo, eBay, Equifax, Uber, Home Depot, MyFitnessPal, Panera, Whole Foods, Chipotle, Omni Hotels & Resorts, Trump Hotels, and Facebook/Cambridge Analytica data breaches or misuses – employees have **_no_** means by which to prevent identity theft, unauthorized tracking or other unlawful or improper use of this highly personal and private information.

7.     In 2015, a data breach at the United States Office of Personnel Management exposed the personal identification information, including biometric data, of over 21.5 million federal employees, contractors, and job applicants. U.S. Off. of Personnel Mgmt., *Cybersecurity Incidents* (2018), *available at* https://www.opm.gov/cybersecurity/cybersecurity-incidents.

8.     A black market already exists for biometric data. Hackers and identity thieves have targeted Aadhaar, the largest biometric database in the world, which contains the personal and biometric data – including fingerprints, iris scans, and a facial photograph – of over a billion Indian citizens. *See* Vidhi Doshi, *A Security Breach in India Has Left a Billion People at Risk of Identity Theft*, The Washington Post (Jan. 4, 2018), *available at* https://www.washingtonpost.com/news/ worldviews/wp/2018/01/04/a-security-breach-in-india-has-left-a-billion-people-at-risk-of-identity-theft/?utm_term=.b3c70259f138.

9.     In January 2018, an Indian newspaper reported that the information housed in Aadhaar was available for purchase for less than $8 and in as little as 10 minutes. Rachna Khaira, *Rs 500, 10 Minutes, and You Have Access to Billion Aadhaar Details*, The Tribune (Jan. 4, 2018), *available at* http://www.tribuneindia.com/news/nation/rs-500-10-minutes-and-you-have-access-to-billion-aadhaar-details/523361.html.

10.     Recognizing the need to protect its citizens from situations like these, Illinois enacted the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.*, specifically to regulate companies that collect, store and use Illinois citizens' biometrics, such as fingerprints.

11.     Notwithstanding the clear and unequivocal requirements of the law, Defendants disregard Power Solutions employees' statutorily protected privacy rights and unlawfully collect, store, disseminate, and use employees' biometric data in violation of BIPA. Specifically, each Defendant has violated and continues to violate BIPA because they did not and continue not to:

3

a.  Properly inform Plaintiff and others similarly situated in writing of the specific purpose and length of time for which their fingerprints were being collected, stored, disseminated and used, as required by BIPA;

b.  Provide a publicly available retention schedule and guidelines for permanently destroying Plaintiff's and other similarly-situated individuals' fingerprints, as required by BIPA; and

c.  Receive a written release from Plaintiff and others similarly situated to collect, store, disseminate or otherwise use their fingerprints, as required by BIPA.

12.  Plaintiff and other similarly-situated individuals are aggrieved because they were not: (1) informed in writing of the purpose and length of time for which their fingerprints were being collected, stored, disseminated and used; (2) provided a publicly available retention schedule or guidelines for permanent destruction of the biometric data; and (3) provided (nor did they execute) a written release, as required by BIPA.

13.  Upon information and belief, Defendant Power Solutions improperly discloses its employees' fingerprint data to at least one third-party, NOVAtime.

14.  Upon information and belief, Defendants Power Solutions and NOVAtime improperly disclose Power Solutions employees' fingerprint data to other, currently unknown, third parties, including, but not limited to third parties that host biometric data in their data center(s).

15.  Upon information and belief, each Defendant lacks retention schedules and guidelines for permanently destroying Plaintiff's and other similarly-situated individuals' biometric data and have not and will not destroy their biometric data as required by BIPA.

16.  Plaintiff and others similarly situated are aggrieved by each Defendant's failure to destroy their biometric data when the initial purpose for collecting or obtaining such data has been satisfied or within three years of the employee's last interactions with the company.

4

17.     Plaintiff and others similarly situated have suffered an injury in fact based on each Defendant's improper disclosures of their biometric data to third parties.

18.     Plaintiff and others similarly situated have suffered an injury in fact based on each Defendant's violations of their legal rights.

19.     These violations have raised a material risk that Plaintiff's and other similarly-situated individuals' biometric data will be unlawfully accessed by third parties. The Illinois Attorney General has just ranked identity theft as the top scam targeting Illinois residents. (*See, e.g.*, Exhibit A).

20.     Employees have a proprietary right to control their biometric information. In failing to comply with the requirements of BIPA, employers intentionally interfere with each employee's right of possession and control over their valuable, unique, and permanent biometric data.

21.     Each Defendant is directly liable for, and had actual knowledge of, the BIPA violations alleged herein.

22.     Accordingly, Plaintiff, on behalf of himself as well as the putative Class, seeks an Order: (1) declaring that each Defendant's conduct violates BIPA; (2) requiring each Defendant to cease the unlawful activities discussed herein; and (3) awarding statutory damages to Plaintiff and the proposed Class.

## PARTIES

23.     Plaintiff Jerome Treadwell is a natural person and a citizen of the State of Illinois.

24.     Defendant Power Solutions is a Delaware corporation that is registered with the Illinois Secretary of State and conducts business in the State of Illinois, including Cook County. Defendant Power Solutions' principle place of business is in Wood Dale, Illinois.

25.     Defendant NOVAtime is a corporation existing under the laws of the State of Illinois, that is registered with the Illinois Secretary of State and conducts business in the State of Illinois, including Cook County.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over Defendants pursuant to 735 ILCS 5/2-209 because they conduct business transactions in Illinois, committed statutory violations and tortious acts in Illinois, and are registered to conduct business in Illinois.

27.     Venue is proper in Cook County because Defendants are authorized to conduct business in this State, Defendants conduct business transactions in Cook County, and Defendants committed the statutory violations alleged herein in Cook County and throughout Illinois.

## FACTUAL BACKGROUND

**I.      The Biometric Information Privacy Act.**

28.     Major national corporations started using Chicago and other locations in Illinois in the early 2000s to test "new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias" 740 ILCS 14/5(c). Given its relative infancy, an overwhelming portion of the public became weary of this then-growing yet unregulated technology. *See* 740 ILCS 14/5.

29.     In late 2007, a biometrics company called Pay by Touch, which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions, filed for bankruptcy. The bankruptcy was alarming to the Illinois legislature because there was suddenly a serious risk that millions of fingerprint records – which, similar to other unique biometric identifiers, can be linked to people's sensitive financial and personal data – could now be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate

protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who used the company's fingerprint scanners were completely unaware the scanners were not transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

30. Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted BIPA in 2008. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS 14/5.

31. Additionally, to ensure compliance, BIPA provides that, for each violation, the prevailing party may recover $1,000 or actual damages, whichever is greater, for negligent violations and $5,000, or actual damages, whichever is greater, for intentional or reckless violations. 740 ILCS 14/20.

32. BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first:

      a.    Informs the subject in writing that a biometric identifier or biometric information is being collected, stored and used;

      b.    Informs the subject in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

      c.    Receives a written release executed by the subject of the biometric identifier or biometric information."

*See* 740 ILCS 14/15(b).

33.     BIPA specifically applies to employees who work in the State of Illinois. BIPA defines a "written release" specifically "in the context of employment [as] a release executed by an employee as a condition of employment." 740 ILCS 14/10.

34.     Biometric identifiers include retina and iris scans, voiceprints, scans of hand and face geometry, and – most importantly here – fingerprints. *See* 740 ILCS 14/10. Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *Id.*

35.     BIPA also establishes standards for how companies must handle Illinois citizens' biometric identifiers and biometric information. *See, e.g.,* 740 ILCS 14/15(c)-(d). For example, BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for that disclosure. *See* 740 ILCS 14/15(d)(1).

36.     BIPA also prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifiers or biometric information (740 ILCS 14/15(c)) and requires companies to develop and comply with a written policy – made available to the public – establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS 14/15(a).

37.     The Illinois legislature enacted BIPA due to the increasing use of biometric data in financial and security settings, the general public's hesitation to use biometric information, and – most significantly – the unknown ramifications of biometric technology. Biometrics are

biologically unique to the individual and, once compromised, an individual is at heightened risk for identity theft and left without any recourse.

38.     BIPA provides individuals with a private right of action, protecting their right to privacy regarding their biometrics as well as protecting their rights to know the precise nature for which their biometrics are used and how they are being stored and ultimately destroyed. Unlike other statutes that only create a right of action if there is a qualifying data breach, BIPA strictly regulates the manner in which entities may collect, store, use, and disseminate biometrics and creates a private right of action for lack of statutory compliance.

39.     Plaintiff, like the Illinois legislature, recognizes how imperative it is to keep biometric information secure. Biometric information, unlike other personal identifiers such as a social security number, cannot be changed or replaced if hacked or stolen.

**II.     Defendants Violate the Biometric Information Privacy Act.**

40.     By the time BIPA passed through the Illinois legislature in mid-2008, most companies who had experimented using employees' biometric data as an authentication method stopped doing so.

41.     However, Defendants failed to take note of the shift in Illinois law governing the collection and use of biometric data. As a result, each Defendant continues to collect, store, use, and disseminate Power Solutions employees' biometric data in violation of BIPA.

42.     Specifically, when employees are hired by Power Solutions, they are required to have their fingerprints scanned to enroll them in its NOVAtime employee database(s).

43.     Power Solutions uses and has used employee time tracking systems supplied by NOVAtime that requires employees to use their fingerprint as a means of authentication. Unlike a

traditional timeclock, all Power Solutions employees have had to use their fingerprints to "punch" in and out of work.

44.     Upon information and belief, Power Solutions failed and continues to fail to inform its employees that it discloses or disclosed their fingerprint data to at least one third party: NOVAtime; fails to inform its employees that it discloses their fingerprint data to other, currently unknown, third parties, which host the biometric data in their data centers; fails to inform its employees of the purposes and duration for which it collects their sensitive biometric data; and fails to obtain written releases from employees before collecting their fingerprints.

45.     Upon information and belief, NOVAtime fails to inform Power Solutions employees that it discloses their fingerprint data to other, currently unknown, third parties, which host the biometric data in their data centers; fails to inform Power Solutions employees of the purposes and duration for which it collects their sensitive biometric data; and fails to obtain written releases from Power Solutions employees before collecting their fingerprints.

46.     Furthermore, each Defendant fails to provide employees with a written, publicly available policy identifying their retention schedule and guidelines for permanently destroying employees' fingerprints when the initial purpose for collecting or obtaining their fingerprints is no longer relevant, as required by BIPA.

47.     The Pay by Touch bankruptcy, which triggered the passage of BIPA, highlights why such conduct – where individuals are aware that they are providing a fingerprint but are not aware to whom or for what purposes they are doing so – is dangerous. This bankruptcy spurred Illinois citizens and legislators into realizing that it is crucial for individuals to understand when providing biometric identifiers such as a fingerprint, who exactly is collecting their biometric data, where it will be transmitted, for what purposes it will be transmitted, and for how long. Each

Defendant disregards these obligations and Power Solutions employees' statutory rights and instead unlawfully collect, store, use, and disseminate employees' biometric identifiers and information, without ever receiving the individual's informed written consent required by BIPA.

48.     Upon information and belief, each Defendant lacks retention schedules and guidelines for permanently destroying Plaintiff's and other similarly-situated individuals' biometric data and have not and will not destroy Plaintiff's and other similarly-situated individuals' biometric data when the initial purpose for collecting or obtaining such data has been satisfied or within three years of the individual's last interaction with each company.

49.     Power Solutions employees are not told what might happen to their biometric data if and when any Defendant merges with another company or worse, if and when any Defendant's business folds, or when the other third parties that have received their biometric data businesses fold.

50.     Since Defendants neither publish BIPA-mandated data retention policies nor disclose the purposes for their collection of biometric data, Power Solutions employees have no idea whether any Defendant sells, discloses, re-discloses, or otherwise disseminates their biometric data. Moreover, Plaintiff and others similarly situated are not told to whom any Defendant currently discloses their biometric data to, or what might happen to their biometric data in the event of a merger or a bankruptcy.

51.     These violations have raised a material risk that Plaintiff's and other similarly-situated individuals' biometric data will be unlawfully accessed by third parties.

52.     By and through the actions detailed above, Defendants disregarded Plaintiff's and other similarly-situated individuals' legal rights in violation of BIPA.

11

### III.     Plaintiff Jerome Treadwell's Experience

53.     Plaintiff Jerome Treadwell works as a production assembler for Power Solutions starting in April 2018 and is still currently employed.

54.     As a condition of employment, Treadwell was required to scan his fingerprints so Power Solutions could use it as an authentication method to track his time worked.

55.     Power Solutions subsequently stored Treadwell's fingerprint data in its NOVAtime employee database(s).

56.     Treadwell was required to scan his fingerprint each time he began and ended his workday.

57.     Treadwell has never been informed of the specific limited purposes or length of time for which any Defendant collected, stored, used, and/or disseminated his biometric data.

58.     Treadwell has never been informed of any biometric data retention policy developed by any Defendant, nor has he ever been informed whether any Defendant will ever permanently delete his biometric data.

59.     Treadwell has never been provided with nor ever signed a written release allowing any Defendant to collect, store, use or disseminate his biometric data.

60.     Treadwell has continuously and repeatedly been exposed to the risks and harmful conditions created by each Defendant's violations of BIPA alleged herein.

61.     No amount of time or money can compensate Treadwell if his biometric data is compromised by the lax procedures through which each Defendant captured, stored, used, and disseminated his and other similarly-situated individuals' biometrics, and Treadwell would not have provided his biometric data to any Defendant if he had known that they would retain such information for an indefinite period of time without his consent.

62.     A showing of actual damages is not necessary in order to state a claim under BIPA. Nonetheless, Treadwell has been aggrieved because he suffered an injury-in-fact based on each Defendant's violations of his legal rights. Defendants intentionally interfered with Treadwell's right to possess and control his own sensitive biometric data. Additionally, Treadwell suffered an invasion of a legally protected interest when each Defendant secured his personal and private biometric data at a time when it had no right to do so, a gross invasion of his right to privacy. BIPA protects employees like Treadwell from this precise conduct, and Defendants had no lawful right to secure this data or share it with third parties absent a specific legislative license to do so.

63.     Treadwell's biometric information is economically valuable, and such value will increase as the commercialization of biometrics continues to grow. As such, Treadwell was not sufficiently compensated by any Defendant for its retention and use of his and other similarly-situated employees' biometric data. Treadwell would not have agreed to work for Power Solutions for the compensation he received if he had known that Defendants would retain his biometric data indefinitely.

64.     Treadwell also suffered an informational injury because each Defendant failed to provide him with information to which he was entitled by statute. Through BIPA, the Illinois legislature has created a right: an employee's right to receive certain information prior to an employer securing their highly personal, private and proprietary biometric data; and an injury – not receiving this extremely critical information.

65.     Treadwell also suffered an injury in fact because each Defendant improperly disseminated his biometric identifiers and/or biometric information to third parties, including but not limited to NOVAtime, and any other third party that hosted the biometric data in their data centers, in violation of BIPA.

66.     Pursuant to 740 ILCS 14/15(b), Treadwell was entitled to receive certain information prior to Defendants securing his biometric data; namely, information advising him of the specific limited purpose(s) and length of time for which each Defendant to collect, store, use and disseminate his private biometric data; information regarding each Defendant's biometric retention policy; and, a written release allowing each Defendant to collect, store, use, and disseminate his private biometric data. By depriving Treadwell of this information, Defendants injured him. *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440, 449 (1989); *Federal Election Commission v. Akins*, 524 U.S. 11 (1998).

67.     Finally, as a result of each Defendant's conduct, Treadwell has experienced personal injury in the form of mental anguish. For example, Treadwell experiences mental anguish and injury when contemplating what would happen to his biometric data if any Defendant went bankrupt, whether any Defendant will ever delete his biometric information, and whether (and to whom) any Defendant would share his biometric information.

68.     Treadwell has plausibly inferred actual and ongoing harm in the form of monetary damages for the value of the collection and retention of his biometric data; in the form of monetary damages by not obtaining additional compensation as a result of being denied access to material information about Defendants' policies and practices; in the form of the unauthorized disclosure of his confidential biometric data to third parties; in the form of interference with his right to control and possess his confidential biometric data; and, in the form of the continuous and ongoing exposure to substantial and irreversible loss of privacy.

69.     As Treadwell is not required to allege or prove actual damages in order to state a claim under BIPA, he seeks statutory damages under BIPA as compensation for the injuries caused by Defendants.

## CLASS ALLEGATIONS

70.    Pursuant to the Illinois Code of Civil Procedure, 735 ILCS 5/2-801, Plaintiff brings

claims on his own behalf and as a representative of all other similarly-situated individuals pursuant

to BIPA, 740 ILCS 14/1, *et seq.*, to recover statutory penalties, prejudgment interest, attorneys'

fees and costs, and other damages owed.

71.    As discussed *supra*, Section 14/15(b) of BIPA prohibits a company from, among

other things, collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a

person's or a customer's biometric identifiers or biometric information, unless it first (1) informs

the individual in writing that a biometric identifier or biometric information is being collected or

stored; (2) informs the individual in writing of the specific purpose and length of time for which a

biometric identifier or biometric information is being collected, stored, and used; *and* (3) receives

a written release executed by the subject of the biometric identifier or biometric information. 740

ILCS 14/15.

72.    Plaintiff seeks class certification under the Illinois Code of Civil Procedure, 735

ILCS 5/2-801 for the following class of similarly-situated employees under BIPA:

> All individuals working for Power Solutions in the State of Illinois who had their
> fingerprints collected, captured, received, or otherwise obtained or disclosed by any
> Defendant during the applicable statutory period.

73.    This action is properly maintained as a class action under 735 ILCS 5/2-801

because:

A.    The class is so numerous that joinder of all members is impracticable;

B.    There are questions of law or fact that are common to the class;

C.    The claims of the Plaintiff are typical of the claims of the class; and,

D.    The Plaintiff will fairly and adequately protect the interests of the class.

**Numerosity**

74.     The total number of putative class members exceeds fifty (50) individuals. The exact number of class members can easily be determined from Power Solutions' payroll records.

**Commonality**

75.     There is a well-defined commonality of interest in the substantial questions of law and fact concerning and affecting the Class in that Plaintiff and all members of the Class have been harmed by Defendants' failure to comply with BIPA. The common questions of law and fact include, but are not limited to the following:

A.      Whether any Defendant collected, captured or otherwise obtained Plaintiff's biometric identifiers or biometric information;

B.      Whether any Defendant properly informed Plaintiff of their purposes for collecting, using, and storing his biometric identifiers or biometric information;

C.      Whether any Defendant obtained a written release (as defined in 740 ILCS 14/10) to collect, use, and store Plaintiff's biometric identifiers or biometric information;

D.      Whether any Defendant has disclosed or re-disclosed Plaintiff's biometric identifiers or biometric information;

E.      Whether any Defendant has sold, leased, traded, or otherwise profited from Plaintiff's biometric identifiers or biometric information;

F.      Whether any Defendant developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of their last interaction with the individual, whichever occurs first;

G.      Whether any Defendant complies with any such written policy (if one exists);

H.      Whether any Defendant used Plaintiff's fingerprints to identify him;

I.      Whether any Defendant's violations of BIPA have raised a material risk that

Plaintiff's biometric data will be unlawfully accessed by third parties;

J.      Whether the violations of BIPA were committed negligently; and

K.      Whether the violations of BIPA were committed willfully.

76.     Plaintiff anticipates that Defendants will raise defenses that are common to the class.

## Adequacy

77.     Plaintiff will fairly and adequately protect the interests of all members of the class, and there are no known conflicts of interest between Plaintiff and class members. Plaintiff, moreover, has retained experienced counsel who are competent in the prosecution of complex litigation and who have extensive experience acting as class counsel.

## Typicality

78.     The claims asserted by Plaintiff are typical of the class members he seeks to represent. Plaintiff has the same interests and suffers from the same unlawful practices as the class members.

79.     Upon information and belief, there are no other class members who have an interest individually controlling the prosecution of his or her individual claims, especially in light of the relatively small value of each claim and the difficulties involved in bringing individual litigation against one's employer. However, if any such class member should become known, he or she can "opt out" of this action pursuant to 735 ILCS 5/2-801.

## Predominance and Superiority

80.     The common questions identified above predominate over any individual issues, which will relate solely to the quantum of relief due to individual class members. A class action is superior to other available means for the fair and efficient adjudication of this controversy because

individual joinder of the parties is impracticable. Class action treatment will allow a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense if these claims were brought individually. Moreover, as the damages suffered by each class member are relatively small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it difficult for individual class members to vindicate their claims.

81.     Additionally, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially more than if claims are treated as a class action. Prosecution of separate actions by individual class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of class members to protect their interests. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

**FIRST CAUSE OF ACTION**
**Violation of 740 ILCS 14/1, *et seq.***
**(On Behalf of Plaintiff and the Class)**

82.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

83.     BIPA requires companies to obtain informed written consent from employees before acquiring their biometric data. Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] first: (1) informs the subject…in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject…in writing of the specific purpose and length of term for which a biometric identifier

or biometric information is being collected, stored, and used; *and* (3) receives a written release executed by the subject of the biometric identifier or biometric information..." 740 ILCS 14/15(b) (emphasis added).

84.     BIPA also prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for that disclosure. *See* 740 ILCS 14/15(d)(1).

85.     Furthermore, BIPA mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention – and, importantly, deletion – policy. Specifically, those companies must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (at most three years after the company's last interaction with the individual); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS 14/15(a).

86.     Each Defendant fails to comply with these BIPA mandates.

87.     Defendant Power Solutions is a Delaware corporation registered to do business in Illinois and thus qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

88.     Defendant NOVAtime is a corporation registered to do business in Illinois and thus qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

89.     Plaintiff is an individual who had his "biometric identifiers" collected by each Defendant (in the form of his fingerprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS 14/10.

90.     Plaintiff's biometric identifiers were used to identify him and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS 14/10.

91.     Each Defendant systematically and automatically collected, used, stored, and disclosed Plaintiff's biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3).

92.     Upon information and belief, Power Solutions systematically disclosed Plaintiff's biometric identifiers and biometric information to at least one third party, NOVAtime.

93.     Upon information and belief, each Defendant systematically disclosed Plaintiff's biometric identifiers and biometric information to other, currently unknown, third parties, which hosted the biometric data in their data centers.

94.     No Defendant informed Plaintiff in writing that his biometric identifiers and/or biometric information were being collected, stored, used, and disseminated, nor did any Defendant inform Plaintiff in writing of the specific purpose and length of term for which his biometric identifiers and/or biometric information were being collected, stored, used and disseminated as required by 740 ILCS 14/15(b)(1)-(2).

95.     No Defendant provides a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information as specified by BIPA. *See* 740 ILCS 14/15(a).

96.     By collecting, storing, and using Plaintiff's and the Class's biometric identifiers and biometric information as described herein, each Defendant violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS 14/1, *et seq*.

97.     Upon information and belief, each Defendant lacks retention schedules and guidelines for permanently destroying Plaintiff's and the Class's biometric data and have not and will not destroy Plaintiff's and the Class's biometric data when the initial purpose for collecting

or obtaining such data has been satisfied or within three years of the individual's last interaction with the company.

98.     These violations have raised a material risk that Plaintiff's and the Class's biometric data will be unlawfully accessed by third parties.

99.     On behalf of himself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each willful and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## SECOND CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiff and the Class)

100.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

101.     Each Defendant owed Plaintiff and the Class a duty of reasonable care. Such duty required Defendants to exercise reasonable care in the collection and use of Plaintiff's and the Class's biometric data.

102.     Additionally, Power Solutions owed Plaintiff and the Class a heightened duty – under which it assumed a duty to act carefully and not put Plaintiff and the Class at undue risk of harm – because of the employment relationship of the parties.

103.     Each Defendant breached its duties by failing to implement a BIPA-compliant biometric time-tracking system with reasonable data security safeguards.

21

104.     Specifically, each Defendant breached its duties by failing to properly inform Plaintiff and the Class in writing of the specific purpose or length of time for which their fingerprints were being collected, stored, used, and disseminated.

105.     Defendants also breached their duties by failing to provide a publicly available retention schedule and guidelines for permanently destroying Plaintiff's and the Class's fingerprint data.

106.     Upon information and belief, each Defendant breached its duties because it lacks retention schedules and guidelines for permanently destroying Plaintiff's and the Class's biometric data and have not and will not destroy Plaintiff's and the Class's biometric data when the initial purpose for collecting or obtaining such data has been satisfied or within three years of the individual's last interaction with either company.

107.     Upon information and belief, Power Solutions breached its duties because it systematically disclosed Plaintiff's biometric identifiers and biometric information to at least one third party: NOVAtime.

108.     Upon information and belief, each Defendant breached its duties because it systematically disclosed Plaintiff's biometric identifiers and biometric information to other, currently unknown, third parties, which hosted the biometric data in their data centers.

109.     These violations have raised a material risk that Plaintiff's and the Class's biometric data will be unlawfully accessed by third parties.

110.     As a direct and proximate cause of each Defendant's negligent misrepresentations, Plaintiff and the other Class members have suffered from diminution in the unique identifying value of their biometric information caused by Defendants' repeated dissemination and exposure

of such information to third-parties, including NOVAtime, and data storage vendors, among others.

111. Defendants knew or should have known that their breaches would cause Plaintiff and the other Class members to experience the foreseeable harms associated with the exposure of their biometrics to third parties, including the discontinuation of Plaintiff's and the Class member's exclusive possession and control of their biometrics and the accompanying loss of the unique identifying value of their biometrics.

112. Further, each Defendant's breach of its duty proximately caused and continues to cause an invasion of Plaintiff's and the Class's privacy, an informational injury, and mental anguish, in addition to the statutory damage provided in BIPA.

113. Accordingly, Plaintiff seeks an order declaring that Defendants' conduct constitutes negligence and awarding Plaintiff and the Class damages in an amount to be calculated at trial.

### PRAYER FOR RELIEF

Wherefore, Plaintiff Jerome Treadwell respectfully requests that this Court enter an Order:

A. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff Jerome Treadwell as Class Representative, and appointing Stephan Zouras, LLP, as Class Counsel;

B. Declaring that Defendants' actions, as set forth above, violate BIPA;

C. Awarding statutory damages of $5,000 for *each* willful and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for *each* negligent violation of BIPA pursuant to 740 ILCS 14/20(1);

D. Declaring that Defendants' actions, as set forth above, constitute negligence;

E. Declaring that Defendants' actions, as set forth above, were willful;

F. Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including an Order requiring Defendants to collect, store, use and disseminate biometric identifiers and/or biometric information in compliance with BIPA;

G.   Awarding Plaintiff and the Class their reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3);

H.   Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

I.   Provide such further relief as the Court deems just and equitable.

## JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Date:   October 30, 2018                          Respectfully Submitted,

                                                  */s/ Andrew C. Ficzko*
                                                  Ryan F. Stephan
                                                  James B. Zouras
                                                  Andrew C. Ficzko
                                                  **STEPHAN ZOURAS, LLP**
                                                  100 N. Riverside Plaza
                                                  Suite 2150
                                                  Chicago, Illinois 60606
                                                  312.233.1550
                                                  312.233.1560 *f*
                                                  Firm ID: 43734
                                                  Aficzko@stephanzouras.com

24

## CERTIFICATE OF SERVICE

I, the attorney, hereby certify that on October 30, 2018, I filed the attached with the Clerk of the Court using the electronic filing system which will send such filing to all attorneys of record.

_/s/ Andrew C. Ficzko_

2018CH13574

FILED
10/30/2018 4:41 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2018CH13574

# EXHIBIT A

# Data Breach QuickView Report

## Data Breach Trends - First Six Months of 2017

### Sponsored by:
### Risk Based Security

### Issued in July 2017





Not Just Security, the Right
Security.

### Mega breaches continue while pace of disclosure shows signs of slowing

- There were 2,227 breaches reported in the first half of 2017, exposing over **6 billion** records.
- Top 10 breaches exposed 5.6 billion of the 6 billion records compromised.
- Top 10 Severity scores averaged 9.82 out of 10.0.
- The Business sector accounted for 56.5% of reported breaches, followed by Unknown (17%), Government (9.1%), Medical (9%), and Education (8.4%).
- The Business sector accounted for 93% of the total records exposed, followed by Government and Unknown (approximately 3% for each). Medical and Education sectors combined accounted for less than 1% of the total records exposed year to date.
- Web (inadvertent online disclosure) continues to be the leading cause of records compromised in 2017, accounting for 68.3% of records exposed, but only 7.1% of incidents reported so far this year.
- 41.6% of reported breaches were the result of Hacking, yet accounted for 30.6% of the exposed records.
- Breaches involving U.S. entities accounted for 61% of the breaches and approximately 30% of the exposed records.
- 29.3% of the breaches exposed between one and 1,000 records, 43.6% of breaches exposed between one and 10,000 records – virtually unchanged from Q12017.
- 121 breaches, or 5.4%, affected Third Parties.
- Fifty (50) breaches - 19 in Q2 and 31 in Q1 - exposed one million or more records.
- Four 2017 breaches are now on the Top 10 List of All Time Largest Breaches.
- The company DU Called, replaced River City Media for the top spot of the single largest breach disclosed, impacting 2 billion records.

Copyright © 2017 Risk Based Security, Inc. All rights reserved.

# Table of Contents

Mid-Year 2017 Compared to Mid-Year of the Previous Four Years ...........................................3

Mid-Year 2017 by Industry, by Month ....................................................................................3

Mid-Year 2017 Analysis by Breach Type ..................................................................................4

Mid-Year 2017 Data Breach Analysis by Threat Vector ...........................................................5

Mid-Year 2017 Exposed Records by Threat Vector ..................................................................5

Mid-Year 2017 Analysis by Data Family ..................................................................................6

Mid-Year 2017 Confidentiality Impact ....................................................................................6

Percentage of Breaches Exposing Data Types YTD 2017 vs. Prior Years ...................................7

Mid-Year 2017 Analysis of Records per Breach .......................................................................8

Mid-Year 2017 Breach Types/Records Exposed – Top 5 ...........................................................8

Distribtuion of Business Groups Within Economic Sectors – Top 3 ..........................................9

Mid-Year 2017 Analysis by Country ........................................................................................9

Mid-Year 2017 Analysis by Country – Top 10........................................................................10

Mid-Year 2017 Exposed Records by Country .........................................................................10

Mid-Year 2017 Distribution of Breaches by State ..................................................................11

Mid-Year 2017 Analysis of US State Rankings- Exposed Records ............................................11

Mid-Year 2017 Breaches Involving Third Parties ...................................................................12

Mid-Year 2017 – Breach Severity Scores & Scoring................................................................13

Mid-Year 2017 – Breach Severity Scores – Top 10 ................................................................13

Top 20 Largest Breaches All Time (Exposed Records Count) ..................................................14

Methodology & Terms .........................................................................................................17

Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## Mid-Year 2017 Compared to Mid-Year of the Previous Four Years



### Number of Incidents by Year – First 6 Months

### Number of Records Exposed by Year – First 6 Months

## Mid-Year 2017 by Industry, by Month



Distribution of Incidents by Industry, by Month



Distribution of Exposed Records by Industry, by Month

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

# Mid-Year 2017 Analysis by Breach Type

### Top 10 Breach Types – First 6 Months



The number of phishing incidents started to decline once the U.S. tax season came to a close.

Despite being the leading cause of records exposed, Web (inadvertent online disclosure) ranked fifth on number of incidents.

### Top 5 Breach Types by Records Exposed
### First 6 Months



While not making the top 5 list very often, a Stolen Computer from the COMELEC (Philippines Election Commission) offices resulted in 55.1 million voter records exposed.

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## Mid-Year 2017 Data Breach Analysis by Threat Vector



**Number of Incidents by Threat Vector**

| Threat Vector | Count |
|---|---|
| Outside | 1794 |
| Inside-Accidental | 189 |
| Inside-Unknown | 87 |
| Inside-Malicious | 80 |
| Unknown | 77 |

16.0% of incidents were the result of insider activity, up slightly from 12.1% of incidents reported in Q12017.

## Mid-Year 2017 Exposed Records by Threat Vector

| Threat Vector | Records Exposed |
|---|---|
| Outside | 2,227,842,612 |
| Inside-Unknown | 2,001,248,057 |
| Inside-Accidental | 1,739,943,232 |
| Unknown | 45,540,090 |
| Inside-Malicious | 567,571 |
| **Total** | **6,015,141,562** |

A single insider incident exposed Two billion records.

## Mid-Year 2017 – Breach Discovery Method

| | Internal Discovery - Incidents | Internal Discovery - Records | External Discovery - Incidents | External Discovery - Records | Undisclosed Discovery - Incidents | Undisclosed Discovery - Records |
|---|---|---|---|---|---|---|
| Q1 | 221 | 65,173,264 | 783 | 3,345,957,501 | 376 | 17,670,845 |
| Q2 | 222 | 2,966,956 | 314 | 486,285,236 | 311 | 2,097,077,760 |
| YTD | 443 | 68,140,220 | 1,097 | 3,832,242,737 | 687 | 2,114,748,605 |

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## Mid-Year 2017 Top 10 Breaches Data Types and Severity Scores[1]

| Breach Type | Records Exposed | Percentage of Total Exposed | Data Type[2] | Severity Score |
|---|---|---|---|---|
| Web | 2,000,000,000 | 33.2% | ADD/NAA/NUM | 10.0 |
| Web | 1,374,159,612 | 22.8% | ADD/EMA/FIN/MISC/NAA | 10.0 |
| Hack | 1,221,893,767 | 20.3% | EMA/PWD | 10.0 |
| Web | 267,693,854 | 4.5% | EMA/NUM | 9.80 |
| Web | 198,000,000 | 3.3% | ADD/DOB/MISC/NAA/NUM | 10.0 |
| Web | 135,000,000 | 2.2% | ADD/FIN/MISC/NAA/NUM/SSN | 9.68 |
| Hack | 129,696,449 | 2.2% | EMA/PWD | 9.71 |
| Hack | 126,761,168 | 2.1% | ADD/NAA/NUM | 9.40 |
| Hack | 91,890,110 | 1.5% | EMA/PWD/USR | 9.56 |
| Hack | 77,000,000 | 1.3% | EMA/PWD/USR | 9.96 |

**The top 10 breaches exposed 5,622,094,960 records, or 93.4% of the total records exposed in the first 6 months**

## Mid-Year 2017 Analysis by Data Family

| Data Family | Percentage of Total Breaches Mid-Year 2016 | Percentage of Total Exposed Records Mid-Year 2016 | Percentage of Total Breaches Mid-Year 2017 | Percentage of Total Exposed Records Mid-Year 2017 |
|---|---|---|---|---|
| Electronic | 90.18% | 99.98% | 93.22% | 99.98% |
| Physical | 6.75% | <1% | 4.62% | <1% |
| Unknown | 3.07% | <1% | 2.16% | <1% |

## Mid-Year 2017 Confidentiality Impact

### Confidentality Impact



Unknown 4%
Potential 15%
Confirmed 81%

The majority of breaches continue to result in confirmed unauthorized access to sensitive data

---

[1] See page 13 for additional detail on these incidents.
[2] See page 17 for a description of abbreviations.

Copyright © 2017 Risk Based Security, Inc. All rights reserved.



## Mid-Year 2017 Analysis by Data Type - Percentage of Breaches

### Incidents by Data Type Exposed



| Data Type | Percentage |
|---|---|
| Name | 40.6% |
| Email Address | 33.2% |
| Physical Address | 30.4% |
| Password | 28.0% |
| Social Security Number | 26.1% |
| Credit Card Number | 18.5% |
| Financial Account Number | 18.5% |
| Undisclosed | 17.9% |
| User Name | 15.5% |
| Miscellaneous | 14.4% |
| Date of Birth | 12.0% |
| Phone Number | 10.5% |

Compared to the same time period in 2016, the percentage of breaches impacting Social Security numbers increased from 17.6% in 2016 to 26.1% in 2017. Likewise, the percentage of breaches impacting Names increased from 36.1% to 40.6% and the percentage impacting physical addresses increased from 21.6% to 30.4%. Research indicates this effect is attributable to the steady rise of successful phishing campaigns targeting W-2 data during the first 4 months of the year.

## Percentage of Breaches Exposing Data Types YTD 2017 vs. Prior Years

| Data Type | First 6 Months 2017 | First 6 Months 2016 | First 6 Months 2015 |
|---|---|---|---|
| Name | 40.6% | 36.1% | 27.8% |
| Email Address | 33.2% | 42.9% | 45.5% |
| Physical Address | 30.4% | 21.6% | 12.3% |
| Password | 28% | 39.8% | 52.2% |

The "W-2 phishing effect" is more evident when comparing the percentage of breaches impacting 2017's top four data types over time. Access credentials in the form of username / email address and password remain popular targets, but the overall number of breaches impacting these records has steadily declined during the first half of 2017 as attention turns to data more directly useful for tax fraud.

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## Mid-Year 2017 Analysis of Records per Breach

| Exposed Records | Number of Breaches | Percent of Total |
|---|---|---|
| Unknown/Undisclosed | 1024 | 46.0% |
| 1 to 100 | 317 | 14.2% |
| 101 to 1,000 | 336 | 15.1% |
| 1,001 to 10,000 | 320 | 14.4% |
| 10,001 to 100,000 | 132 | 5.9% |
| 100,001 to 500,000 | 36 | 1.6% |
| 500,001 to 999,999 | 12 | 0.5% |
| 1 M to 10 M | 30 | 1.3% |
| > 10 M | 20 | 0.9% |

For the third year in a row, the number of incidents with exposed records either unknown or unreported increased. At this point in 2015, it was 27.6%; in 2016, it was 35.4%.

## Mid-Year 2017 Breach Types/Records Exposed – Top 5

| Breach Category | Number of Breaches | Number of Records Exposed | Average Records per Breach | Percent of Total Records Exposed |
|---|---|---|---|---|
| Hacking | 927 | 1,839,750,699 | 1,984,629 | 30.59% |
| Skimming | 272 | 4,874 | 18 | 0.00% |
| Phishing | 253 | 458,964 | 1,814 | 0.01% |
| Virus/Malware | 209 | 6,918,120 | 33,101 | 0.12% |
| Web | 158 | 4,069,836,698 | 25,758,460 | 67.67% |

## Mid-Year 2017 Analysis of Incidents by NAICS Economic Sector



### Distribution of Incidents by Economic Sector

  Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## Distribtuion of Business Groups Within Economic Sectors – Top 3

| Economic Sector | Business Group | Percentage of Breaches Within Economic Sector |
|---|---|---|
| Information (51) | Software / Web Services | 79.9% |
| | Mass Media | 11.2% |
| | Telecommunications | 7.3% |
| HealthCare (62) | Non-Hospital Facilities | 33.3% |
| | Hospitals | 29.5% |
| | Practitioner Offices | 29.5% |
| Public Sector (92) | Federal | 33.8% |
| | State | 20.6% |
| | Cities | 19.5% |

## Mid-Year 2017 Analysis by Country



### Incidents by Location

- Other — 23.6%
- USA — 61.4%
- Unknown — 15.0%

### Records Exposed by Location

- Other — 67.9%
- USA — 31.1%
- Unknown — 1.0%

The Top 10 countries accounted for 1,708, or 76.6% of the breaches reported and 97.7% of the records compromised.

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## Mid-Year 2017 Analysis by Country – Top 10



### Incidents by Country - Top 10

| Country | Incidents |
|---|---|
| United States | 1367 |
| United Kingdom | 104 |
| Canada | 59 |
| India | 52 |
| Australia | 34 |
| China | 22 |
| Ukraine | 19 |
| Russian Federation | 19 |
| Indonesa | 18 |
| Iran | 14 |

North America accounted for 64.2% of breaches

## Mid-Year 2017 Exposed Records by Country

| Ranking | Number of Breaches | Country | Total Exposed Records | Average Records per Breach | Median Number of Records | Percentage of Exposed Records |
|---|---|---|---|---|---|---|
| 1 | 22 | China | 3,822,024,257 | 173,728,375 | 3,371,754 | 48.83% |
| 2 | 1367 | United States | 3,746,193,334 | 2,740,449 | 1,700 | 47.86% |
| 3 | 52 | India | 179,055,018 | 3,443,366 | 308 | 2.29% |
| 4 | 2 | Philippines | 55,254,020 | 27,627,010 | - | 0.71% |
| 5 | 7 | Hong Kong | 12,041,792 | 1,720,256 | 1,890,876 | 0.15% |
| 6 | 4 | South Africa | 6,700,000 | 1,675,000 | - | 0.09% |
| 7 | 104 | United Kingdom | 2,401,829 | 23,095 | 669 | 0.03% |
| 8 | 59 | Canada | 2,107,262 | 35,716 | 503 | 0.03% |
| 9 | 2 | Finland | 1,100,023 | 550,012 | - | 0.01% |
| 10 | 7 | Japan | 722,096 | 103,157 | 121 | 0.01% |

Large breaches affecting 1,000,000 or more records heavily influences the average number of records lost in certain countries. The median number of records lost in the five countries reporting the most breaches ranges between 308 and 1,700, with Australia coming in at 872.

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## Mid-Year 2017 Distribution of Breaches By State



### Incidents by US State – Top 10

| State | Value |
|-------|-------|
| CA | 140 |
| TX | 98 |
| FL | 94 |
| NY | 90 |
| PA | 60 |
| VA | 46 |
| OH | 45 |
| IL | 44 |
| MD | 44 |
| NC | 35 |

The top 10 states represent 51% of US breaches.

## Mid-Year 2017 Analysis of US State Rankings- Exposed Records

| Exposed Records Ranking | US State | Total Exposed Records | Number of Breaches | Exposed Records/Breach | Percentage of USA Exposed Records |
|---|---|---|---|---|---|
| 1 | WA | 1,375,336,881 | 27 | 50,938,403 | 73.42% |
| 2 | NJ | 33,724,579 | 29 | 1,162,917 | 1.31% |
| 3 | CA | 10,690,370 | 140 | 76,360 | 0.31% |
| 4 | NY | 8,163,474 | 90 | 90,705 | 0.19% |
| 5 | AR | 4,890,000 | 7 | 698,571 | 0.16% |
| 6 | TX | 4,777,984 | 98 | 48,755 | 0.15% |
| 7 | GA | 3,798,732 | 23 | 165,162 | 0.10% |
| 8 | MD | 2,674,211 | 44 | 60,778 | 0.09% |
| 9 | MI | 2,426,296 | 22 | 110,286 | 0.07% |
| 10 | FL | 1,519,843 | 94 | 16,169 | 0.02% |

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

**Mid-Year 2017 Breaches Involving Third Parties**

## Third Party Breaches by Business Type



- Medical
- Government
- Business
- Unknown
- Education

- Organizations classified in the business sector account for more than 50% of the breaches impacting data belonging to customers, clients or other 3rd parties.
- Three of the largest breaches reported in the first six months impacted 3rd parties.
- Hacking remains the dominant breach type for incidents impacting 3rd Parties, with regard to both the number of breaches and the number of records compromised.



  Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## Mid-Year 2017 – Breach Severity Scores & Scoring

We can all readily agree that not all data breaches are created equal. Where disagreement arises is when we attempt to rate the 'severity' or 'impact' of a breach. At Risk Based Security we have combined our knowledge of the security industry, business experience and our comprehensive data breach information to calculate a Data Breach Severity Score.



**Breach Severity Scores by Quarter**

| | 9.0 - 10.0 | 8.0 - 8.99 | 7.0 - 7.99 | 6.0 - 6.99 | 5.0 - 5.99 | 4.0 - 4.99 | 3.0 - 3.99 | 2.0 - 2.99 | 1.0 - 1.99 | < 1 |
|---|---|---|---|---|---|---|---|---|---|---|
| ■1Q2017 | 12 | 11 | 27 | 78 | 319 | 574 | 244 | 60 | 46 | 4 |
| ■2Q2017 | 6 | 5 | 44 | 17 | 39 | 245 | 330 | 143 | 18 | 5 |

On a positive note, breach severity scores declined in the second quarter of 2107. 58.2% of breaches reported in Q2 scored 3 or below while 25.7% of Q1 reported breaches scored 3 or below.

## Mid-Year 2017 – Breach Severity Scores – Top 10

| Score | Reported | Organization | Top 10 Summary |
|---|---|---|---|
| 10 | Q2 | DU Group dba DU Caller | (Web) 2,000,000,000 user phone numbers, names and addresses inappropriately made accessible in an uncensored public directory |
| 10 | Q1 | NetEase, Inc. dba 163.com | (Hacking) 1,221,893,767 email addresses and passwords stolen by hackers and sold on the Dark Web by DoubleFlag |
| 10 | Q1 | River City Media, LLC | (Web) 1,374,159,612 names, addresses, IP addresses, and email addresses, as well as an undisclosed number of financial documents, chat logs, and backups exposed by faulty rsync backup |
| 10 | Q2 | Deep Root Analytics | (Web) Approximately 198,000,000 voter names, addresses, dates of birth, phone numbers, political party affiliations, and other demographic information exposed in an unsecured Amazon S3 bucket |

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

| Score | Reported | Organization | Top 10 Summary |
|-------|----------|--------------|----------------|
| 9.96 | Q2 | Edmodo | (Hacking) 77,000,000 user email addresses, usernames, and `bcrypt` hashed passwords with salts stolen by hackers through undisclosed means |
| 9.80 | Q1 | EmailCar | (Web) 267,693,854 email addresses and phone numbers exposed in an unsecure MongoDB installation and later dumped on the Internet |
| 9.71 | Q1 | Tencent Holdings Ltd dba QQ.com | (Hacking) 129,696,449 email addresses and passwords stolen by hackers and sold on the Dark Web by DoubleFlag |
| 9.68 | Q2 | National Social Assistance Programme (India) | (Web) Roughly 135,000,000 Aadhaar numbers and 100,000,000 linked bank account numbers, as well as names, caste, religion, addresses, phone numbers, photographs, and assorted financial details leaked on government web portals |
| 9.56 | Q2 | Youku | (Hacking) 91,890,110 user accounts with usernames, email addresses and MD5 encrypted passwords compromised by hackers and offered for sale |
| 9.45 | Q1 | Yahoo Japan | (Hacking) 23,590,165 email addresses and passwords stolen by hackers and sold on the Dark Web by DoubleFlag |

## Top 20 Largest Breaches All Time (Exposed Records Count)

| Breach Reported Date | Summary | Records Exposed | Organization's Name | Industry-Sector | Breach Location |
|----------------------|---------|-----------------|---------------------|-----------------|-----------------|
| **Highest All Time** 5/13/2017 | User phone numbers, names and addresses inappropriately made accessible in an uncensored public directory | 2 Billion | DU Caller Group (DU Caller) | Business - Technology | China |
| **Number 2** 3/3/2017 | Names, addresses, IP addresses, and email addresses, as well as an undisclosed number of financial documents, chat logs, and backups, exposed by faulty `rsync` backup. | 1.3 Billion | River City Media, LLC | Business - Technology | United States |
| **Number 3** 1/25/2017 | A database holding email addresses and passwords stolen by hackers and offered for sale on the dark web. | 1.2 Billion | NetEase, Inc. dba 163.com | Business – Technology | China |

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

| Breach Reported Date | Summary | Records Exposed | Organization's Name | Industry-Sector | Breach Location |
|---|---|---|---|---|---|
| **Number 4** 12/14/2016 | While investigating the #4 incident on this list, a second hacking event was discovered targeting user names, email addresses, phone numbers, dates of birth, hashed passwords and security questions and associated answers. | 1 Billion | Yahoo | Business - Technology | United States |
| **Number 5** 9/22/2016 | Hack exposes user names, email addresses, phone numbers, dates of birth, hashed passwords and security questions and associated answers. | 500 Million | Yahoo | Business - Technology | United States |
| **Number 6** 10/18/2016 | Hackers exploit a Local File Inclusion vulnerability, compromising member email addresses, usernames, and encrypted passwords, IP addresses and membership statuses. | 412 Million | FriendFinder Networks, Inc | Business - Technology | United States |
| **Number 7** 5/27/2016 | Hack exposes user account records containing SHA1 encrypted passwords, email addresses. | 360 Million | MySpace | Business - Technology | United States |
| **Number 8** 1/1/2017 | Email addresses and phone numbers were exposed in an unsecure MongoDB installation, which was later downloaded and dumped on the Internet | 267 Million | EmailCar | Business - Technology | China |
| **Number 9** 8/22/2014 | Hack of websites exposes names, registration numbers, usernames and passwords. | 220 Million | Organization's Name has not been reported | Unknown | South Korea |
| **Number 10** 12/3/2016 | Hackers offer for sale a database containing a variety of personal and financial details. | 203 Million | Organization's Name has not been reported | Unknown | Unknown |
| **Number 11** 10/19/2013 | Fraudulent account used to gain access to credit card numbers, social security numbers, names, and financial account numbers. | 200 Million | Court Ventures, Inc. | Business - Data | United States |
| **Number 12** 6/19/2017 | Unsecured Amazon S3 bucket exposes voter names, addresses, dates of birth, contact information and voter preferences. | 198 Million | Deep Root Analytics | Business / Business | United States |

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

| Breach Reported Date | Summary | Records Exposed | Organization's Name | Industry-Sector | Breach Location |
|---|---|---|---|---|---|
| **Number 13** 12/28/2015 | Mis-configured database exposes voter names, dates of birth, addresses, phone numbers, political party affiliations, and genders. | 191 Million | Organization's Name has not been reported | Unknown | United States |
| **Number 14** 6/21/2014 | Hack exposes trip details of customers after cracking MD5 hashes | 173 Million | NYC Taxi & Limousine Commission | Government - City | United States |
| **Number 15** 6/23/2016 | Hack exposes USA voter information. | 154 Million | Organization's Name has not been reported | Unknown | United States |
| **Number 16** 10/3/2013 | Hack exposed customer names, IDs, encrypted passwords and debit/ credit card numbers with expiration dates, source code and other customer order information. | 152 Million | Adobe Systems, Inc. | Business - Technology | United States |
| **Number 17** 3/17/2012 | Firm may have illegally bought and sold customers' information. | 150 Million | Shanghai Roadway D&B Marketing Services Co. | Business - Data | China |
| **Number 18** 5/21/2014 | Hack exposes names, encrypted passwords, email addresses, registered addresses, phone numbers and dates of birth. | 145 Million | eBay, Inc. | Business - Retail | United States |
| **Number 19** 6/8/2013 | North Korean Hackers expose email addresses and identification numbers. | 140 Million | Organization's Name has not been reported | Unknown | South Korea |
| **Number 20** 5/2/2017 | Leaky governmental websites expose Aadhaar numbers, banking details, names and other personal information. | 135 Million | National Social Assistance Programme | Government - Federal | India |

      Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## Methodology & Terms

Risk Based Security's research methods include automated processes coupled with traditional human research and analysis. Our proprietary applications crawl the Internet 24x7 to capture and aggregate potential data breach breaches for our researchers to analyze. In addition, the research team manually verifies news feeds, blogs, and other sources looking for new data breaches as well as new information on previously disclosed incidents. The database also includes information obtained through Freedom of Information Act (FOIA) requests, seeking breach notification documentation from various state and federal agencies in the United States. The research team extends our heartfelt thanks to the individuals and agencies that assist with fulfilling our requests for information.

### Data Standards and the use of "Unknown"

In order for any data point to be associated with a breach entry, Risk Based Security requires a high degree of confidence in the accuracy of the information reported as well as the ability to reference a public source for the information. In short, the research team does not guess at the facts. For this reason the term "Unknown" is used when the item cannot be verified in accordance with our data validation requirements. This can occur when the breached organization cannot be identified but leaked data is confirmed to be valid or when the breached organization is unwilling or unable to provide sufficient clarity to the data point.

### Breach Types are defined as follows:

| Name | Description |
|------|-------------|
| Disposal Computer | Discovery of computers not disposed of properly |
| Disposal Document | Discovery of documents not disposed of properly |
| Disposal Drive | Discovery of disk drives not disposed of properly |
| Disposal Mobile | Discovery of mobile devices not disposed of properly |
| Disposal Tape | Discovery of backup tapes not disposed of properly |
| Email | Email communication exposed to unintended third party |
| Fax | Fax communication exposed to unintended third party |
| Fraud SE | Fraud or scam (usually insider-related), social engineering |
| Hack | Computer-based intrusion |
| Lost Computer | Lost computer (unspecified type in media reports) |
| Lost Document | Discovery of documents not disposed of properly, not stolen |
| Lost Drive | Lost data drive (unspecified if IDE, SCSI, thumb drive, etc.) |
| Lost Laptop | Lost laptop (generally specified as a laptop in media reports) |
| Lost Media | Media (e.g. disks) reported to have been lost by a third party |
| Lost Mobile | Lost mobile phone or device such as tablets, etc. |
| Lost Tape | Lost backup tapes |
| Missing Document | Missing document, unknown or disputed whether lost or stolen |
| Missing Drive | Missing drive, unknown or disputed whether lost or stolen |
| Missing Laptop | Missing laptop, unknown or disputed whether lost or stolen |
| Missing Media | Missing media, unknown or disputed whether lost or stolen |
| Other | Miscellaneous breach type not yet categorized |
| Phishing | Masquerading as a trusted entity in an electronic communication to obtain data |
| Seizure | Forcible taking of property by a government law enforcement official |
| Skimming | Using electronic device (skimmer) to swipe victims' credit/debit card numbers |
| Snail Mail | Personal information in "snail mail" exposed to unintended third party |
| Snooping | Exceeding intended privileges and accessing data not authorized to view |
| Stolen Computer | Stolen desktop (or unspecified computer type in media reports) |
| Stolen Document | Documents either reported or known to have been stolen by a third party |
| Stolen Drive | Stolen data drive, unspecified if IDE, SCSI, thumb drive, etc. |
| Stolen Laptop | Stolen Laptop (generally specified as a laptop in media reports) |
| Stolen Media | Media generally reported or known to have been stolen by a third party |

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

| Name | Description |
|---|---|
| Stolen Mobile | Stolen mobile phone or device such as tablets, etc. |
| Stolen Tape | Stolen backup tapes |
| Unknown | Unknown or unreported breach type |
| Virus (Malware) | Exposure to personal information via virus or Trojan (possibly classified as hack) |
| Web | Web-based intrusion, data exposed to the public via search engines, public pages |

**Data Type Definitions**

| Abbreviation | Description |
|---|---|
| CCN | Credit Card Numbers |
| SSN | Social Security Numbers (or Non-US Equivalent) |
| NAA | Names |
| EMA | Email Addresses |
| MISC | Miscellaneous |
| MED | Medical |
| ACC | Account Information |
| DOB | Date of Birth |
| FIN | Financial Information |
| UNK | Unknown |
| PWD | Passwords |
| ADD | Addresses |
| USR | User Name |
| NUM | Phone Number |
| IP | Intellectual Property |

*NO WARRANTY.*

*Risk Based Security, Inc. makes this report available on an "As-is" basis and offers no warranty as to its accuracy, completeness or that it includes all the latest data breach breaches. The information contained in this report is general in nature and should not be used to address specific security issues. Opinions and conclusions presented reflect judgment at the time of publication and are subject to change without notice. Any use of the information contained in this report is solely at the risk of the user. Risk Based Security, Inc. assumes no responsibility for errors, omissions, or damages resulting from the use of or reliance on the information herein. If you have specific security concerns please contact Risk Based security, Inc. for more detailed data loss analysis and security consulting services.*

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.

## About Risk Based Security

Risk Based Security (RBS) provides detailed information and analysis on Data Breaches, Vendor Risk Scores and Vulnerability Intelligence. Our products, Cyber Risk Analytics (CRA) and VulnDB, provide organizations with access to the most comprehensive threat intelligence knowledge bases available, including advanced search capabilities, access to raw data via API, and email alerting to assist organizations in taking the right actions in a timely manner. In addition, our YourCISO offering provides organizations with on-demand access to high quality security and information risk management resources in one, easy to use web portal.

VulnDB is the most comprehensive and timely vulnerability intelligence available and provides actionable information about the latest in security vulnerabilities via an easy-to-use SaaS Portal, or a RESTful API for easy integration into GRC tools and ticketing systems. VulnDB allows organizations to search on and be alerted to the latest vulnerabilities, both in end-user software and the third-party libraries or dependencies that help build applications. A subscription to VulnDB provides organizations with simple to understand ratings and metrics on their vendors and products, and how each contributes to the organization's risk-profile and cost of ownership.

Cyber Risk Analytics (CRA) provides actionable security ratings and threat intelligence on a wide variety of organizations. This enables organizations to reduce exposure to the threats most likely to impact them and their vendor base. In addition, our PreBreach vendor risk rating, the result of a deep-view into the metrics driving cyber exposures, are used to better understand the digital hygiene of an organization and the likelihood of a future data breach. The integration of PreBreach ratings into security processes, vendor management programs, cyber insurance processes and risk management tools allows organizations to avoid costly risk assessments, while enabling businesses to understand its risk posture, act quickly and appropriately to proactively protect its most critical information assets.

YourCISO provides organizations with on-demand access to high quality security and information risk management resources in one, easy to use web portal. YourCISO provides organization ready access to a senior executives and highly skilled technical security experts with a proven track record, matched specifically to your needs. The YourCISO service is designed to be an affordable long term solution for addressing information security risks. YourCISO brings together all the elements an organization needs to develop, document and manage a comprehensive information security program.

For more information, please visit:

https://www.riskbasedsecurity.com/
https://vulndb.cyberriskanalytics.com/
https://www.cyberriskanalytics.com/
https://www.yourciso.com/

Or call 855-RBS- RISK.

 Copyright © 2017 Risk Based Security, Inc. All rights reserved.